IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **4:23CR3117** |
| vs. | |
| NICANDRO GARCIA PEREZ, | **FINDINGS, RECOMMENDATION AND ORDER** |
| Defendant. | |

This matter is before the Court on Defendant Nicandro Garcia Perez's motion to suppress and request for a *Franks* hearing. Filing No. 34. Perez seeks to suppress any and all evidence obtained as a result of a detention of his person and search of his vehicle on June 9, 2023. Perez argues the detention and search violated his Fourth Amendment rights because (1) Nebraska State Patrol Trooper Alexander Winters lacked reasonable suspicion to detain him and (2) he did not voluntarily consent to the search. Perez also argues that a warrant issued by a Douglas County, Nebraska judge on June 9, 2023 (the "Warrant") is fruit of the unlawful detention and search. He requests a *Franks* hearing on the Warrant.

The Court held an evidentiary hearing on Perez's motion to suppress on April 16, 2024. The Court stated the motion would be deemed submitted upon receipt of the transcript. The transcript was filed on May 6, 2024. The matter is now ripe for disposition. For the reasons discussed below, the undersigned recommends Perez's motion to suppress and Perez's request for a *Franks* hearing should be denied.

## STATEMENT OF FACTS

After reviewing the evidence admitted at the hearing and listening to the testimony of Trooper Winters, the undersigned magistrate judge finds the following facts are credible.

On June 9, 2023, Perez was traveling on Interstate 80. While on patrol, Trooper Winters received a call from a York County Deputy. The York County Deputy informed Trooper Winters that a vehicle with a missing front license plate had pulled into the eastbound York rest stop near mile marker 350. Filing No. 55 at 9:17–10:6; 28:11–17.

Trooper Winters proceeded to such rest stop and, when there, observed a vehicle (a gray BMW with black wheels and windows) matching the York County Deputy's description. Filing No. 55 at 11:6–16. The Vehicle did not have a front license plate but had a rear California license plate. Filing No. 55 at 11:17–22.

Trooper Winters approached the Vehicle and asked Perez if the Vehicle was his, to which Perez responded in the affirmative. Filing No. 29-2 at 1 (Exhibit 102). The bodycam footage indicates Perez and Trooper Winters interacted for approximately seventeen minutes before Trooper Winters asked for Perez's consent to search the Vehicle. Exhibit 101 at 0:00–16:48. During this seventeen-minute interaction, Trooper Winters was the sole law enforcement officer at the scene and Perez is freely walking around the rest stop. Filing No. 55 at 16:15–17:5, 19–23. Perez is not provided his *Miranda* warnings during this time and is never advised he is "free to leave." Filing No. 55 at 16:18–17:5, 22:18–20. The Court will set forth the portions of the interaction between Trooper Winters and Perez relevant to this motion:

- Trooper Winters and Perez had a conversation as to whether he was driving alone. Perez ultimately clarified he was driving alone, and his wife was waiting for him in Omaha. Exhibit 101 at 0:40–1:07.

- After this initial exchange, which pursuant to the bodycam footage lasted less than a minute and a half, Trooper Winters asked, "Can I chat with you?" Perez agreed— "Yeah." Exhibit 101 at 1:15–1:17. Trooper Winters followed up by asking, "You have time to chat?" Perez responded, "No. I'm just, I'm talking to her." Exhibit 101 at 1:15–1:20. Trooper Winters continued to ask Perez questions about where he was from, and Perez continued to respond. Exhibit 101 at 1:20–1:50.

- During their conversation, Perez clarified the difference between Orange County, California and Orange, California and identified the part of the state in which he lived to Trooper Winters. Exhibit 101 at 1:20–1:50.

- During their conversation, Perez also initiated questions and conversations to Trooper Winters, including:
  - Asking whether he has been to California (Exhibit 101 at 1:53–1:55);

- o Complimenting his sunglasses[1] (Exhibit 101 at 2:07–2:11); and

- o Asking whether Trooper Winters was married. Exhibit 101 at 2:57–3:00.

- There are no significant delays between the time Trooper Winters asks a question and Perez answers the question set forth in the bodycam footage. Perez also easily answers questions posed by Trooper Winters using more complex or uncommon words like "fentanyl," "cocaine," and "methamphetamine." Exhibit 101 at 16:11–16:27.

- Perez uses English to tell the person he is talking to on the phone that, "It is going to be a moment." Exhibit 101 at 4:39–4:43.

- Perez tells Trooper Winters, after talking with him for over four and a half minutes, "Sorry, I speak a little bit of English, you know." Trooper Winters responds, "No, you're doing great, man. I'm having like a full conversation with you." Perez says, "I'm, I'm trying, you know?" Trooper Winters comments, "Good practice for you." Perez then says, "I'm trying all the time, you know? Especially here, you know." Exhibit 101 at 4:51–5:05.

- Trooper Winters asks Perez what he does for work. Perez initially responded that he worked for "Uber, DoorDash, [and] Lyft." After Trooper Winters indicated Perez must work quite a bit to afford a BMW like the Vehicle, Perez clarified that those were his secondary jobs, and his primary job was working in a supply warehouse. Exhibit 101 at 11:50–12:25.

- During their encounter, Trooper Winters asked Perez if he had his driver's license, which Perez turned over to Trooper Winters. Exhibit 101 at 4:35–4:50.

- Trooper Winters was parked 4–5 car lengths away from the Vehicle and, by extension, Perez, who was standing in front of the Vehicle. Filing No. 55 at 12:6–8, 15–16. After speaking with Perez for approximately five minutes, Trooper Winters walked back to his patrol car to run Perez's license. Exhibit 101 at 5:32–5:50. Perez followed Trooper Winters to the patrol car, despite any request or demand by Trooper Winters for Perez to do so. Exhibit 101 at 5:31–7:13; Filing

---

[1] It appears Perez does not know or could not remember the English word for "sunglasses." Perez says, "I like your" before he trails off and forms a circle around his eye with his fingers. Trooper Winters provides, "My glasses?" and Perez answers, "Yeah." Exhibit 101 at 2:07–2:11.

No. 55 at 17:10–13. After he finished running the license, Trooper Winters asked Perez, "We can go stand back over there, if you want?" Perez said, "No, no, that's okay." Exhibit 101 at 10:10–10:18; Filing No. 55 at 39:14–18. Trooper Winters then stated, "We can walk back over there if you want?" before he began walking back to the Vehicle. Perez followed Trooper Winters and their conversation continued. Exhibit 101 at 10:18–10:33.

After viewing the bodycam footage and listening to the testimony of Trooper Winters, this Court finds the interaction between Trooper Winters was non-confrontational and concludes Trooper Winters' testimony to this effect is credible. Furthermore, after viewing the bodycam footage and listening to the testimony of Trooper Winters, this Court finds Trooper Winters' conclusion that Perez could speak English is credible.

After Trooper Winters and Perez had been interacting for approximately seventeen minutes, Trooper Winters asks Perez, "Can I search your car?" Perez responds, "You search my car? Why, I don't do nothing, you know." Exhibit 101 at 16:45–16:53. After Trooper Winters explains why, Perez says, "Yeah," Filing No. 55 at 21:4–17, gestures towards the car, and then walks around the car. Exhibit 101 at 16:45–17:20. Trooper Winters advises he is going to get some gloves and asks whether that is okay, to which Perez says, "That's okay." Exhibit 101 at 17:15–17:21. Trooper Winters then returns to his car to obtain gloves and, when he comes back, asks Perez whether the car is unlocked. Perez then unlocks the Vehicle with his key fob. Exhibit 101 at 18:20–18:33; Filing No. 55 at 25:23–26:4. During the search of the Vehicle, Trooper Winters asked Perez to stand in front of the car so he could see him. Filing No. 55 at 24:20–25:8. Perez was not restrained in any way. *See* Filing No. 55 at 16:15–17. Trooper Winters ultimately located cocaine in the Vehicle and Perez was placed under arrest. Filing No. 55 at 16:10–14.

On June 9, 2023, Nebraska State Patrol Sergeant Kevin Finn requested—and a Nebraska state court issued—a search warrant for Perez's phones. Filing No. 29-3 (Exhibit 103).

**ANALYSIS**

### I.      Detention.

Perez alleges he was unlawfully detained without reasonable suspicion. In support of this argument, Perez argues the original encounter between Trooper Winters and Perez was not consensual because: (1) Perez could not appropriately understand the English language and (2) Trooper Winters continued to question Perez after Perez answered "no" in response to Trooper Winters asking whether he had "time to chat." Perez also argues Trooper Winters lacked reasonable suspicion to detain Perez as it was unlawfully prolonged.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." However, "not all personal encounters between law enforcement and citizens fall within the ambit of the Fourth Amendment." *United States v. DaCruz-Mendez,* 970 F.3d 904, 908 (8th Cir. 2020) (quotations omitted). "Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *United States v. Griffith,* 533 F.3d 979, 983 (8th Cir. 2008) (internal citations omitted).

### A.  *Consensual Encounter.*

Defendant argues Perez's Fourth Amendment right was violated when Trooper Winters detained him without reasonable suspicion that he had committed a crime. However, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer,* 460 U.S. 491, 497 (1983) (citations omitted). Moreover, "the fact that the officer identifies himself as a police officer, without more" does not "convert the encounter into a seizure requiring some level of objective justification." *Id.* (citations omitted). If an individual is not detained, there cannot be a seizure pursuant to the Fourth Amendment and, similarly, cannot be a violation of an individual's constitutional rights on that basis. *Id.*

As such, "[c]onsensual encounters between officers and citizens are permitted. 'Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage— provided they do not induce cooperation by coercive means.'" *DaCruz-Mendez*, 970 F.3d at 908 (internal citation omitted) (quoting *United States v. Drayton*, 536 U.S. 194, 201 (2002)). However, "a consensual encounter becomes a seizure when a reasonable person in the same circumstances would not feel free to leave." *United States. v. Parker*, 993 F.3d 595, 602 (8th Cir. 2021).

To determine whether the interactions between Perez and Trooper Winters constituted a detention or a consensual encounter, the Court must determine whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Florida v. Bostick*, 501 U.S. 429, 435–436 (1991). The Court should look at the "totality of the circumstances" in making this decision, "looking at factors such as the brandishing of weapons, the use of commands, or language indicating compliance is necessary—among others." *DaCruz-Mendes*, 970 F.3d at 908 (citing *United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012). Other factors considered when making this conclusion include an individual's freedom of movement, whether he was informed the questioning was voluntary or that he was free to leave, the number of officers present, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the individual's property, or the officer's indication that the person is the focus of a particular investigation. *Parker*, 993 F.3d at 602; *Griffith*, 533 F.3d at 983. No one factor is dispositive. *Parker*, 993 F.3d at 602.

The undersigned has reviewed the bodycam footage and heard the testimony of Trooper Winters, which it finds credible. The encounter between Perez and Trooper Winters occurred in a public location with other individuals around. At no time did Trooper Winters restrict Perez's freedom of movement. No weapons were brandished during the encounter between Perez and Trooper Winters, the only law enforcement officer at the scene prior to arrest, and the conversation between these two individuals was cordial, non-confrontational, and friendly. At no time prior to finding the cocaine does Trooper Winters command Perez to do anything or indicate compliance with his directives is

necessary.[2] Furthermore, though Trooper Winters asked Perez for his driver's license approximately five minutes into the encounter, he returned his license to Perez four minutes later. Exhibit 101 at 4:34–4:48 (Trooper Winters requests license); 8:12–8:20 (Trooper Winters returns license). Accordingly, Perez was only briefly without the entirety of his personal belongings. The consensual nature of the encounter is further supported by the questions and conversations Perez initiates with Trooper Winters, i.e., by complimenting his sunglasses and asking Trooper Winters whether he was married.

Finally, upon careful review of the bodycam footage, the undersigned finds Perez's English-language skills would not have impeded a reasonable person from understanding they were free to leave. Perez spoke with the individual on the phone in English, corrected Trooper Winters' misinterpretations on various occasions, and did not pause for a significant amount of time before he answered Trooper Winters' questions. Perez's English-language skills are not grammatically flawless, but the undersigned concludes the evidence supports the finding that Perez was able to speak English fluently enough to comfortably communicate with and understand Trooper Winters.

After considering the totality of the circumstances, this Court finds the facts support a finding that the encounter between Perez and Trooper Winters was consensual until Trooper Winters found cocaine in the Vehicle and, as such, Perez was not seized pursuant to the Fourth Amendment prior to his arrest. *Cf. DaCruz-Mendez*, 970 F.3d at 908 (affirming the district court's finding that an encounter was consensual and did not violate a defendant's Fourth Amendment rights when two officers stopped a defendant as he entered a taxi but there was no brandishing of weapons, no physical touch, or threats or commands to indicate to defendant that he was not free to terminate the encounter).

---

[2] Perez's counsel argued during the motion to suppress hearing that Perez initially refused to talk to Trooper Winters and later refused to follow Trooper Winters to a new location. As articulated in the findings of fact section, Perez initially responded, "No. I'm just, I'm talking [to my wife]," when Trooper Winters asked him, "You have time to chat?" Exhibit 101 at 1:15–1:20. Approximately ten minutes later, Perez had followed Trooper Winters to stand in front of his patrol car while Trooper Winters ran Perez's license. After Trooper Winters ran the license, he asked if Perez wanted to move to stand in front of the Vehicle again. Perez said, "No, no, that's okay." Exhibit 101 at 10:10–10:18; Filing No. 55 at 39:14–18. Neither of these refusals is determinative—the totality of the circumstances still indicates a reasonable person in Perez's position would have felt free to leave. *See, e.g.*, *U.S. v. Grant*, 696 F.3d 780, 785–86 (8th Cir. 2012) (reasonable person would still have felt free to leave after officer asked defendant if officer could call dog for sniff test in response to defendant initially refusing to allow search and stating that he wanted to leave).

**B. *Reasonable Suspicion.***

Perez also argues Trooper Winters unlawfully prolonged the encounter—seizing him without reasonable suspicion. The undersigned finds the interaction between Trooper Winters and Perez was a consensual encounter. Accordingly, Trooper Winters did not need reasonable suspicion and the undersigned declines to address Perez's reasonable suspicion arguments. *See U.S. v. Lillich*, 6 F.4th 869, 877 n.6 (8th Cir. 2021) (declining to address whether an encounter was supported by reasonable suspicion because it was a consensual encounter); *see generally U.S. v. White*, 81 F.3d 775, 779 (8th Cir. 1996) (request for consent to search during a consensual encounter "permissible with or without reasonable suspicion").

**II.      Search of the Vehicle.**

Without a warrant to search the Vehicle and in the absence of probable cause or exigent circumstances, the validity of the search is reliant upon Perez's consent. "'A consensual search does not violate the Fourth Amendment if the consent was given voluntarily and without coercion.'" *DaCruz-Mendez*, 970 F.3d at 908 (quoting *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005)). The government "has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Royer*, 460 U.S. at 497 (citations omitted). "[W]hether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." *United States v. Guerrero*, 374 F.3d 584, 588 (8th Cir. 2004) (alteration in original) (quoting *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998)). Accordingly, this Court's "focus is not whether [Perez] subjectively consented, but rather, whether a reasonable officer would believe consent was given and can be inferred from words, gestures, or other conduct." *Id.*

The Court must analyze the totality of the circumstances when analyzing whether an officer had consent to search. *DaCruz-Mendez*, 970 F.3d at 908 (quoting *United States v. Carr*, 895 F.3d 1083, 1089 (8th Cir. 2018)). When considering the voluntariness of a defendant's consent to search, courts are to look to certain factors, none of which are determinative. These factors include the defendant's: behavior, age, intelligence and education, knowledge of his constitutional rights, whether he was under the influence of

drugs or alcohol, and whether he objected to the search or stood silently when it was occurring. *United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006). These factors also include whether the defendant was in custody or under arrest at the time he consented to the search, whether he was in a public or secluded space, whether the police officers detained and questioned the defendant for a significant period of time before obtaining his consent, whether the defendant was subjected to threats, physical intimidation or punishment or whether law enforcement made promises or misrepresentations upon which the defendant relied when giving his consent. *Id.* Relevant to the case at hand, the Eighth Circuit "ha[s] found that individuals can consent to searches despite language difficulties." *DaCruz-Mendez*, 970 F.3d at 908 (first citing *United States v. Cedano-Medina*, 366 F.3d 682, 684–687 (8th Cir. 2004); and then citing *United States v. Mendoza-Cepeda*, 250 F.3d 626, 629 (8th Cir. 2001)).

Perez argues he did not give voluntary consent to search his car. He argues he was the subject of implied coercion because he: cannot speak English; Trooper Winters did not allow him to continue his phone conversation and required him to follow him back to the Vehicle; he was not advised he did not have to stay at the rest stop; and he was not informed of his *Miranda* rights.

First, as set forth above, the Court must determine whether Trooper Winters reasonably believed he had consent to search the Vehicle. The Court has reviewed Trooper Winters' bodycam footage and heard the testimony of Trooper Winters, which it finds credible, and concludes it was more than reasonable for Trooper Winters to believe Perez adequately spoke English and, further, that Perez consented to the search of his Vehicle. *DaCruz-Mendez,* 970 F.3d at 909 (concluding a search was consensual when the defendant, who alleged to have difficulties speaking and understanding English and Spanish (his first language was Portuguese), was in a public space when the search was initiated, the police officers made no threats or misrepresentations, and the defendant did not object to the search at any point or make any indication that he did not understand what the law enforcement officer was asking).

Like the defendant in *DaCruz-Mendez*, Perez's "responsiveness to [Trooper Winters'] questions and affirmative response when asked if his [Vehicle] could be

searched would indicate to a reasonable officer that the search was consensual." *Id.* at 909. Nearly all factors weigh in favor of this conclusion.

The evidence before the Court indicates Perez was 38 years old at the time of the encounter,[3] of at least average intelligence and education, was not under the influence of drugs or alcohol, and, further, had prior experience with law enforcement,[4] which would indicate knowledge of his constitutional rights. Perez and Trooper Winters' interactions, which occurred at a public rest area with other individuals around, were cordial and friendly, and Perez was never detained or arrested prior to Trooper Winters locating cocaine in the Vehicle.

In addition, Perez can be seen in the bodycam footage freely moving about and scrolling on his phone throughout the entirety of the interaction. Trooper Winters was the only law enforcement officer present before he located the illegal drugs. The search occurred only eighteen minutes after the interaction between Trooper Winters and Perez began. Exhibit 101 at 16:45–18:37. Moreover, at no time did Perez object to the search. Instead, Perez advised Trooper Winters could search the vehicle, stayed near the Vehicle (but was not detained in any form or fashion) while Trooper Winters walked away from the Vehicle to obtain gloves from his patrol car, and, then, when Trooper Winters returned to the Vehicle, unlocked the Vehicle for Trooper Winters with his key fob.

Trooper Winters made no promises or misrepresentations to Perez prior to obtaining his consent, which he obtained without any threat or physical intimidation. Moreover, though Trooper Winters did not advise Perez of his *Miranda* rights or the fact that he did not have to consent to the search, these factors are not determinative. *U.S. v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007) (emphasis added) ("We have not required an officer to provide *Miranda* warnings before requesting consent to search or held that an absence of *Miranda* warnings would make an otherwise voluntary consent involuntary."); *U.S. v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001) ("Although [the defendant] was not

---

[3] Trooper Winters testified he believed Perez was middle aged. Filing No. 55 at 21:18–21.

[4] Exhibit 105 indicates that Perez was previously charged with a three-count complaint (all charges were dismissed). Filing No. 47-2 at 1. Exhibit 106, the pretrial services report, indicates Perez was also previously fined twice for driving without a license. Filing No. 47-3 at 2.

advised of his right to refuse consent, that is not in and of itself sufficient to find that consent was not voluntarily given.").

The totality of the circumstances illustrate Trooper Winters reasonably believed the search of the Vehicle to be consensual. As such, Perez's Fourth Amendment right to be free from unreasonable searches was not violated.

### III.   Search Warrant.

Perez argues the Court should suppress the evidence found as a result of the Warrant as: (1) the Warrant was acquired via unlawfully obtained evidence (i.e., fruit of the poisonous tree) and (2) the Warrant is invalid pursuant to *Franks*. Perez requests a *Franks* hearing.

#### A. *Derivative Evidence.*

Generally, absent an exception, the Court should exclude evidence that derives from illegally obtained evidence. *See Wong Sun v. United States*, 371 U.S. 471, 416 (1963). As set forth above, Perez's Fourth Amendment rights were not violated. As such, the information in the Warrant is not tainted by any alleged illegal actions by Trooper Winters.

#### B. Franks *Hearing*.

Pursuant to *Franks v. Delaware*, a defendant is allowed a hearing when he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included [or excluded] by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." 438 U.S. 154 (1978). A defendant cannot prevail on a *Franks* challenge if the warrant affidavit continues to establish probable cause after the challenged offensive portions of the affidavit are excluded and any additional alleged facts are included. *U.S. v. Carpenter*, 422 F.3d 738, 745 (8th Cir. 2005).

Perez argues the Warrant should have: (1) set forth the language barrier between Trooper Winters and Perez; (2) information received by a York County Deputy regarding whether Perez avoided police conduct; and (3) certain statements of Perez. Perez also sets forth specific statements and/or certain clarifications he believes should have been included in the Warrant. Perez's desired alterations are delineated in a modified affidavit attached to this finding and recommendation.

However, even if the Warrant had been altered to include the information and make the clarifications set forth by Perez, the warrant would have still indicated that there was 40 pounds of cocaine in the Vehicle. Filing No. 29-3 at 2 (Exhibit 103). This fact, in and of itself, provided probable cause to issue the warrant. *See, e.g.,* *U.S. v. Steffens*, No. 19-CR-4022, 2019 WL 3304815, at *13 (N.D. Iowa July 23, 2019), *report and recommendation adopted as modified*, 418 F. Supp. 3d 337, 373 (N.D. Iowa 2019), *aff'd sub nom. Lillich*, 6 F.4th 869 ("Even if all the challenged statements were omitted from the affidavit in their totality, the affidavit would still provide probable cause that [the defendants] were involved in drug trafficking, based on the evidence that officers discovered pound quantities of methamphetamine in their vehicle."). As such, a *Franks* hearing is not needed on these issues and the undersigned recommends the Court deny Perez's motion for a *Franks* hearing.

For the reasons stated above,

IT HEREBY IS RECOMMENDED to the Honorable Susan M. Bazis, United States District Judge that Defendant's motion to suppress, (Filing No. 34), be denied in its entirety, including Defendant's request for a *Franks* hearing.

The Defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this Court may be held to be a waiver of any right to appeal the Court's adoption of the recommendation.

FURTHER, IT HEREBY IS ORDERED,

A telephonic conference with counsel will be held before the undersigned magistrate judge at 10:00 a.m. on June 12, 2024 to discuss setting any change of plea hearing, or the date of the jury trial and deadlines for disclosing experts as required under Rule 16. Counsel for all parties shall use the conferencing instructions provided by the Court to participate in the call.

Dated this 29th day of May, 2024.

BY THE COURT:

*s/ Jacqueline M. DeLuca*
United States Magistrate Judge